GLEN DAVIS et ux., Appellants, v. W. W. WILSON et al., Appellees.

No. 46813.

FEBRUARY 5, 1946.

REHEARING DENIED APRIL 5, 1946.

Bennett Cullison, of Harlan, and Jones, Cambridge & Carl, of Atlantic, for appellants.

Paul W. Richards, of Red Oak, Rudolph & Rudolph and Dalton & Dalton, all of Atlantic, for appellees.

GARFIELD, J.—Prior to December 1, 1942, plaintiff Glen Davis owned the three-hundred-forty-four-acre Cass county farm involved in this controversy. The farm consists of three tracts: two hundred acres on which the buildings are situated, eighty acres east of the two hundred, and sixty-four acres which corner with the "eighty." The two hundred acres, which Davis acquired March 1, 1929, for $30,000, were subject to a mortgage for $18,000 that was foreclosed in the fall of 1941. Execution sale was had on December 1, 1941, time for redemption expired, and sheriff's deed was issued to Breece, the purchaser (holder of the mortgage), on December 7, 1942.

Defendant Wilson is an uncle of Davis' wife. Davis is a farmer who fed cattle on a large scale. Wilson had financed Davis in several transactions commencing about June 1940, when plaintiffs (Davis and wife) mortgaged the eighty-acre tract to Wilson for $4,400, the amount Davis paid for it about that time. In April 1941, plaintiffs mortgaged the sixty-four acres to Wilson for $3,000. Davis had paid $2,750 for this tract in January 1940.

On December 23, 1942, Wilson contracted to buy the two hundred acres from Breece, the grantee of the sheriff's deed, for $20,380, slightly more than the vendor had invested in the tract. Wilson paid Breece $1,500 earnest money at that time. The contract was completed on January 15, 1943, when Wilson paid Breece the balance of the $20,380 and received deed to the two hundred acres. On the same day (January 15, 1943) Wilson, who then held the mortgages for $4,400 and $3,000 respectively, demanded, and plaintiffs executed and delivered to him, a warranty deed to the remaining one hundred forty-four acres of the farm (the eighty- and sixty-four-acre tracts). The stated consideration was "one dollar and other valuable considerations." Plaintiffs claim both these deeds to Wilson were not absolute conveyances but were for security only.

On February 28, 1944, Wilson contracted to sell the three

hundred forty-four acres to defendant Rudolph for $30,948, the exact amount Wilson had invested in the farm, with interest at five per cent to that date. In August 1943, Wilson had paid delinquent taxes of $1,452 against the farm. Aside from this amount, Wilson had invested the $20,380, paid for the two hundred acres, and $7,400, the amount of the two mortgages on the eighty and sixty-four acres respectively. Rudolph paid Wilson $2,000 on the execution of his contract and $3,948 on March 3, 1944, when he took a deed from Wilson and gave back a mortgage for $25,000.

Plaintiffs continued to occupy the farm. Wilson testified that Davis agreed on January 15, 1943, and also about March 1st, to pay rent of $1,400 for the farming season of 1943, to sow twenty-five acres to alfalfa, make certain repairs on the farm, and to move off March 1, 1944. Davis denied there was any agreement about rent. No rent was paid, nor was any demanded until after the sale to Rudolph. Although the contract between Wilson and Rudolph does not mention any rents, both testified the claim for the 1943 rent was assigned by Wilson to Rudolph.

G. C. Dalton was attorney for the holder of the $18,000 mortgage against the two hundred acres and prepared the papers by which Wilson acquired title to the farm.

In the spring of 1944, Mr. and Mrs. Davis brought this action against Wilson, Rudolph, and Dalton, claiming in part that: Davis still owns the farm, the deed to Wilson of the two hundred acres was merely to secure him for the $20,380 which it is contended Wilson loaned Davis; the deed to Wilson of the one hundred forty-four acres was merely additional security; Rudolph acquired title with knowledge of the facts; and the farm is worth $21,600 more than Davis is owing Wilson. Plaintiffs asked that title be quieted against defendants, the amount Davis owes Wilson be determined, defendants be required to convey the farm upon payment to Wilson of such amount, and for such other relief as justice requires.

Following a trial, plaintiffs' petition was dismissed and title was quieted in Rudolph. Plaintiffs concede they are entitled to no relief as against Dalton. We therefore disregard him as a party.

Defendants contend: Both deeds of the farm to Wilson were absolute conveyances; in purchasing the two hundred acres Wilson was attempting to protect himself against loss on the two loans totaling $7,400 on the two smaller tracts, which they claim were excessive; and the consideration for the deed of the one hundred forty-four acres was the cancellation of the two notes and mortgages totaling $7,400.

Both Wilson and Dalton, the attorney who prepared the deed to the one hundred forty-four acres, testified that when the deed was executed Wilson returned to Davis both the $4,400 and the $3,000 note and mortgage. Davis was not asked about the return of these two notes and mortgages but Mrs. Davis, who was present when the deed was signed, insisted these notes and mortgages were not surrendered by Wilson. In the absence of a denial by Davis we must accept the testimony of Wilson and Dalton as to this.

However, it is conceded the mortgages were not released of record until about March 1, 1944, when Wilson sold the farm to Rudolph. Wilson's explanation of the thirteen-and-one-half-months delay in releasing the mortgages is that the courthouse was closed when the transaction in Dalton's office was finished; he (Wilson) returned that night to his home in Missouri, about one hundred twenty-five miles from Atlantic; it was necessary for his wife to sign one of the releases, and the matter was neglected.

Certain indebtedness of Davis to Wilson not as yet mentioned is indirectly involved in the controversy. In August 1940, Wilson loaned Davis $1,600. Sometime later Davis borrowed from Wilson $4,010 to pay for cattle. On May 7, 1942, Wilson loaned Davis $12,905 to take up a chattel mortgage on Davis' cattle held by a third party. On this date, Davis gave Wilson a note and chattel mortgage on cattle for $19,140 to cover the loans of $12,905, $4,010, and $1,600. Some interest and a "bonus" to Wilson of $50 were also included in this $19,140. After this transaction all that Davis owed Wilson was secured by mortgages. The note and chattel mortgage of May 7, 1942, were called the "cattle loan." Davis paid the balance of this loan in full on February 26, 1944, two days before Wilson contracted to sell the farm to Rudolph.

Although further reference to the facts is necessary, we consider now the applicable rules of law. Of course, as to the one hundred forty-four acres, the relation of mortgagee and mortgagor existed between Wilson and Davis when these two tracts were deeded to Wilson. He, however, held no mortgage on the two hundred acres when they were deeded to him by Breece.

We have held many times, and it is the holding of courts generally, that the right to redeem is a favorite of equity; any transfer of the mortgagor's interest to the mortgagee is viewed with suspicion and carefully scrutinized; it will operate as a bar to the equity of redemption only when it clearly and unequivocally appears that both parties intended an absolute sale—otherwise it will be regarded as a mere change in the form of security operative as a mortgage. It is largely a question of the intention of the parties. In arriving at such intention courts look behind the form of the instruments to the true relationship between the parties.

Where the mortgagor deeds to the mortgagee for a nominal consideration the deed is presumed to be but a continuation of the security and the right of redemption is presumed to continue. The burden of proving the fairness of such a transfer is on the mortgagee and it will be sustained only upon a clear and satisfactory showing that it is free from any element of advantage or oppression. A conveyance from mortgagor to mortgagee will not extinguish the equity of redemption in case of doubt as to whether a sale was intended. See, in support of these views, Guttenfelder v. Iebsen, 230 Iowa 1080, 300 N. W. 299, and authorities there cited, especially extended annotation, 129 A. L. R. 1435; Koob v. Zoller (Bliss, C.J.), 231 Iowa 1106, 1110, 1111, 3 N. W. 2d 130, 132, 133; annotations 79 A. L. R. 937, 155 A. L. R. 1104.

We have often said and the authorities agree that each case of this kind must be determined by a consideration of its own peculiar circumstances. The conduct of the parties leading up to the making of a deed from mortgagor to mortgagee is frequently of great weight in determining whether the intent was to buy and sell or merely give security in a new form. Annotation 129 A. L. R. 1435, 1513. Likewise their subsequent

conduct frequently throws light upon their understanding and intent in entering into the transaction. Id. 1515; Tansil v. McCumber (Morling, J.), 201 Iowa 20, 31, 206 N. W. 680.

With reference to the deed to the two hundred acres: It is well established that where one purchases land and borrows all or part of the purchase price from another, the title may pass directly to the one who furnishes the money, as security for such loan. The purchaser may show by parol that the title is held by the third party as security for the advancement. Brown v. Hermance (Oliver, J.), 233 Iowa 510, 514, 10 N. W. 2d 66, 68, and authorities there cited; Krebs v. Lauser, 133 Iowa 241, 244, 110 N. W. 443.

The debt of the real owner to the titleholder need not exist by covenant but may be implied. Here, if Davis requested Wilson to purchase the two hundred acres for Davis' benefit and Wilson did so purchase it, an obligation on the part of Davis to repay Wilson the amount advanced by him with interest would necessarily be implied. This would establish the relation of debtor and creditor as fully as if Wilson had loaned the money direct to Davis and the latter had in turn paid Breece the purchase price. Tansil v. McCumber, 201 Iowa 20, 30, 206 N. W. 680, and cases cited; Jones v. Gillett (McClain, J.), 142 Iowa 506, 514, 118 N. W. 314, 121 N. W. 5.

Under our repeated holdings parol testimony is admissible, notwithstanding sections 11285 (statute of frauds) and 10049 (creation of express trust in real estate) Code, 1939, to show the two deeds to Wilson were given for security only. See cases heretofore cited, especially Krebs v. Lauser and Jones v. Gillett. See, also, Kleinsorge v. Clark, 232 Iowa 313, 316, 4 N. W. 2d 433, 434, 435, and cases cited; Bigler v. Jack, 114 Iowa 667, 671, 672, 87 N. W. 700.

We think defendants have failed to sustain their burden of showing that the transaction whereby plaintiffs deeded the one hundred forty-four acres to Wilson was fair and free from any element of oppression or that an absolute sale to Wilson was intended. Also we are convinced the deed to Wilson of the two hundred acres was intended to secure him for the purchase money advanced by him and not as an absolute conveyance.

Wilson testified repeatedly that since the spring or summer of 1940 he considered purchasing the Davis farm. It is plaintiffs' testimony, however, that throughout this period they were negotiating with Wilson for a loan on the farm, and especially for him to take over the loan on the two hundred acres. A study of this long record convinces us plaintiffs are right, that the negotiations throughout were for a loan and not a sale, and that Wilson's testimony as to this cannot be accepted. Our conclusion is supported by much oral testimony and by four letters Wilson wrote plaintiffs between May 26, 1940, and March 20, 1941.

In the first of these letters Wilson, evidently referring to the loan on the two hundred acres, said, "It will look better in our hands than where it is now." In the second letter, Wilson wrote, "We don't want that loan unles we can get it on all the place 200 home place what you bought and that 80 we helped you get. We can loan up to 20,000 on this place at 5 per cent." The third letter states, "I will send money soon as possible. * * * It will take about three days for the money to get up their." In the fourth letter Wilson wrote, "When you get that road fixted on East side of Eighty and that corner so you can get them two pieces togeather then I Will come up then we can get the security fixted up."

Plaintiffs testified to repeated statements by Wilson leading up to the making of the two deeds to him that he would "save the farm" for plaintiffs and, after the deeds were made, that he had gotten the place back for them. Plaintiffs are corroborated by four other witnesses. One of them, Mrs. Davis' mother, Wilson's sister, testified:

"The first time I remember of him talking about the two hundred acres was sometime in December. [Wilson's contract with Breece was made December 23.] He said he came up to save the land for Glen. He told me many times he was going to help Glen save his land. He said he didn't want any land, but he wanted his interest and his money invested up here with Glen. I believe they made the final deal on January the 15th. He was out to my house on that day. He came out there and said, 'I have saved Glen's land for him. I showed those men

up there that they couldn't treat a nephew of mine like that. I was going to see that Glen got his land back.'"

This same witness testified that when the "cattle loan" was paid on February 26, 1944, Wilson told her, "Glen doesn't owe me any more money now except for the place."

While Wilson denied the above testimony, we think it must be accepted. Plaintiffs' claim is supported not only by the four witnesses to whom we have referred but also by Dr. Peterson, who negotiated with Breece for the purchase of the two hundred acres. A contract was prepared for the sale of the two hundred acres by Breece to Peterson, who made a down payment thereon. There is testimony that Peterson had offered $500 less than Breece was asking but Peterson testified Breece had orally accepted his offer.

In any event, when Wilson came to Atlantic from his home in Missouri at the time the contract for the two hundred acres was made, he first went to plaintiffs' home. He and Davis then went to see Breece, who was a stranger to Wilson. Davis introduced Wilson to Breece. There had been no negotiations between Wilson and Breece for the purchase of the two hundred acres. Breece testified he told Davis, the two hundred acres had been sold to Dr. Peterson. Davis and Wilson then went to see Mr. Dalton, the attorney, and then to see Dr. Peterson, in an evident effort to induce him to withdraw as a purchaser. Dr. Peterson, apparently disinterested and reliable, gave this testimony, which is entitled to considerable weight:

"After that I had some conversation with Glen Davis about it when Mr. Wilson was present. * * * Glen Davis came in with Mr. Wilson. I told Glen I didn't want to buy the farm out from under him, and he said he had made arrangements to buy the farm and then after we had this conversation I brought Mr. Wilson in. Mr. Wilson came into the office and Glen Davis told me he had made arrangements to buy the farm and I told him if he had made arrangements to buy it then I would go ahead and tell them to return my check and I would withdraw my intention of getting the farm. *Mr. Davis said he was going to get the money from Mr. Wilson and Mr. Wilson was present at the*

*conversation. Mr. Wilson said he was going to help Glen get the farm."*

Peterson further said he then withdrew his offer. From Peterson's office, Davis and Wilson went to Mr. Dalton's office, where the contract for the purchase of the two hundred acres was prepared and executed. It is clear Peterson would not have withdrawn his offer if he had not been led to believe by Davis *and Wilson* that Davis was the real buyer with Wilson's financial assistance. There is no reason why Peterson should have withdrawn merely to permit Wilson to buy the farm "out from under" Davis. Further, there is no reason why Davis should have been anxious for Peterson to withdraw if he did not understand that Wilson was to advance the money to enable him to repurchase the two hundred acres.

Breece held the title to the two hundred acres (as well as the mortgage which was foreclosed) as executor of an estate. The contract provided merely for an executor's deed to Wilson and that Breece would not pay taxes then due nor furnish an abstract of title. Wilson procured no abstract of title. Davis testified the abstract remained in his possession.

There was no suggestion that plaintiffs deed the one hundred forty-four acres to Wilson till January 15, 1943, when Wilson settled with Breece for the two hundred acres and took that deed in his own name. He then demanded that plaintiffs deed him the one hundred forty-four acres. Both plaintiffs, especially Mrs. Davis, were unwilling to comply with this demand and did so, according to their testimony, only upon assurance from Wilson that he would give them a writing to show they were still the owners. No such writing was ever furnished. When plaintiffs asked Wilson about it after the deed was made, they testified he told them that when the cattle loan was paid he would deed them the farm and take back a mortgage at four per cent. However, two days after the cattle loan was paid Wilson sold the farm to Rudolph for the exact amount of his investment, with interest, without divulging the sale to plaintiffs, to either of his sisters, or other close relatives who lived near Atlantic. The same evening that Wilson sold to Rudolph, February 28, 1944, Davis and his wife's brother drove

Wilson from Atlantic to his home in Missouri, but Wilson admits he told them nothing about his sale to Rudolph. This is consistent with plaintiffs' claim that Wilson was not frank with them in demanding the deed to the one hundred forty-four acres.

· At no time before the one hundred forty-four acres .were deeded to Wilson was there any discussion as to the purchase price. Nor are we able to believe that plaintiffs understood they were parting with the ownership of the farm. Indeed we conclude from Wilson's testimony that he had no desire to own the farm but exacted the deed to the one hundred forty-four acres in an attempt to realize on the security without the necessity of a foreclosure.

The parties did not deal on equal terms. Plaintiffs were the distressed debtors; Wilson the creditor who held security for large amounts on most of their property. It was hard for plaintiffs to resist Wilson's demand for a deed to the one hundred forty-four acres. He was an older relative who had frequently visited in plaintiffs' home. Plaintiffs acted without independent advice. The authorities agree that this inequality, though in itself insufficient to impeach the transaction, is a circumstance to be considered. Guttenfelder v. Iebsen, 230 Iowa 1080, 1084, 300 N. W. 299, 302; Fort v. Colby (Weaver, C. J.), 165 Iowa 95, 131, 144 N. W. 393, and authorities cited.

In the annotation in 129 A. L. R. 1435, 1518, numerous decisions are cited which hold "that a deed from mortgagor to mortgagee *although intended to effectuate a sale* of the mortgaged premises will not be given that effect by a court of equity where it appears, presumptively or otherwise, that in obtaining the conveyance the mortgagee took an unconscientious advantage of his position as mortgagee or that in any substantial respect his conduct was wanting in fairness." (Emphasis added.)

It was unfair for Wilson to represent to plaintiffs that he would save their farm for them (we are convinced he made such representations) and later insist he had no intention of doing so but that his purpose was to become an absolute purchaser.

We think plaintiffs' claim the more reasonable. If Wilson's contention is accepted, plaintiffs were surrendering their land without receiving anything in return. There is no apparent

motive for such act on their part. That this is a proper matter to be considered, see Fort v. Colby, 165 Iowa 95, 122, 123, 144 N. W. 393, and cases cited.

Numerous authorities, including many Iowa decisions, say that where the value of the property is substantially more than the consideration for the deed it is a strong circumstance that the deed was intended as a mortgage. Annotations 90 A. L. R. 953, 954, 129 A. L. R. 1435, 1504. We think the value of the Davis farm was at least $10 per acre more than the amount Wilson had invested in it.

Davis testified the value of the farm was $160 per acre. While this is probably much too high, we think the values fixed by defendants' witnesses at least somewhat low. Two real-estate men for defendants fixed the value per acre on March 1, 1944, of the one hundred forty-four acres at $55 to $65, of the two hundred acres at $110 to $120, and of the whole farm at $90 to $95. When Wilson sold to Rudolph, after paying $1,452 back taxes in August 1943, and computing interest to date, Wilson had a trifle less than $90 per acre invested in the farm. The fact remains that Davis acquired the two hundred acres March 1, 1929, long after the collapse of the land boom of 1920, for $150 per acre, a third of which ($10,000) he paid in cash. The two hundred acres were then mortgaged for $20,000, upon which Davis paid an additional $2,000. While there was a further decline in land value after Davis acquired the two hundred acres, there was a substantial increase from that decline before 1943.

While of course it is a circumstance, it is not of great importance whether we accept Wilson's testimony or Davis' denial that Davis agreed to pay what was called rent of $1,400 for the year 1943. (We note that a year's interest at five per cent on the amount Wilson had invested in the farm when he claims the rental arrangement was made would be $1,389.) It is well settled that the execution of a lease from the titleholder to one who claims to be the equitable owner or the payment of rent does not necessarily disprove the fact of equitable ownership. Jones v. Gillett, 142 Iowa 506, 512, 118 N. W. 314, 316, 121 N. W. 5, and cases cited; Fort v. Colby, 165 Iowa 95, 125, 144 N.

W. 393; Brown v. Hermance, 233 Iowa 510, 515, 10 N. W. 2d 66, 68; annotation 129 A. L. R. 1435, 1511-1513.

If Wilson had not taken undue advantage of his position as mortgagee and acted unfairly in exacting the deed to the one hundred forty-four acres, the surrender of the notes and mortgages totaling $7,400 (although the mortgages were not released until the sale to Rudolph) would strongly indicate the parties intended a sale of that part of the farm. See annotation 129 A. L. R. 1435, 1500-1504. But such conduct on the part of Wilson justifies our refusal to enforce the deed as an absolute transfer, notwithstanding the surrender of the notes and mortgages. Id. 1518-1520.

Plaintiffs acted promptly in bringing this suit—within a few weeks after Wilson sold to Rudolph. It can scarcely be contended plaintiffs were influenced, in bringing suit, by any increase in land values after the deeds were made to Wilson. There could not have been much increase during the time that intervened between the making of the deeds and the commencement of suit.

It follows from what we have said that Davis would be entitled to redeem the farm if title had been retained by Wilson. But he transferred the title to Rudolph, who made settlement without actual notice that plaintiffs claimed either deed to Wilson amounted to a mortgage. We think plaintiffs have no right to redeem as against defendant Rudolph and that the quieting of Rudolph's title must be affirmed. There can be no doubt of this as to the one hundred forty-four acres deeded by plaintiffs to Wilson. The only theory we know by which we could possibly hold Rudolph's title subject to an equitable title in plaintiffs is that their possession of the farm amounted to notice of plaintiffs' rights. But this theory is not applicable here, at least as to the one hundred forty-four acres.

Of course the rule is elementary that possession of land is ordinarily notice of the rights therein of the party in possession. Booth v. Cady, 219 Iowa 439, 443, 257 N. W. 802, and cases cited. While the authorities are in conflict, in Iowa and a majority of jurisdictions there is a well-recognized exception to this rule where the party in possession is the grantor in a recorded deed. (Here the deed from plaintiffs to Wilson was

recorded.) According to these decisions, the continued possession of the grantor for a not unreasonable time after the deed imparts no notice of any claim adverse to the deed. So far as a purchaser or encumbrancer from the titleholder is concerned, the grantor's deed is a conclusive declaration that he has reserved no rights and estops him from setting up any arrangement by which the deed is impaired. This exception to the rule does not apply where the grantor's possession is for an unreasonable time or is adverse to the titleholder. Clark v. Chapman, 213 Iowa 737, 746, 239 N. W. 797 (where the party in possession claimed a recorded deed made by him was in fact a mortgage); Tutt v. Smith, 201 Iowa 107, 113, 114, 204 N. W. 294, 48 A. L. R. 394, and cases cited; annotation 105 A. L. R. 845, 849, 850, 869; 66 C. J. 1172, 1173, section 1019; 27 R. C. L. 728, section 492.

As to the two hundred acres deeded to Wilson by Breece, the law is less clear that plaintiffs' possession was insufficient to impart notice to Rudolph that plaintiffs claimed this deed (also recorded) was in fact a mortgage. However there is substantial authority that the continued possession of the mortgagor after a sale under foreclosure is not constructive notice of any right not appearing of record. See annotation 105 A. L. R. 845, 872, 873. Furthermore, plaintiffs do not ask to be permitted to redeem anything less than the entire farm. We hold, therefore, that Rudolph's title to the entire farm must be quieted.

Since Wilson's transfer to Rudolph prevented plaintiffs from redeeming, the only relief available to plaintiffs is a money judgment against Wilson for the excess in value of the farm over the amount owing him by Davis (including taxes paid by Wilson and interest on the whole debt to March 1, 1944, while plaintiffs were in possession). Plaintiffs pray for such relief in the event their right to redeem cannot be granted. As stated, the amount of Wilson's investment in the farm on March 1, 1944, was slightly less than $90 per acre. We think the value of the farm, both on January 15, 1943, and March 1, 1944, at least $100 an acre. Plaintiffs are therefore entitled to judgment against Wilson for $3,440, with interest at five per cent from March 1, 1944.

As to defendants Rudolph and Dalton, the decree is affirmed. As to defendant Wilson the decree is reversed and the cause is remanded for a decree in harmony with this opinion.— Affirmed as to defendants Rudolph and Dalton; reversed and remanded as to defendant Wilson.

BLISS, C. J., and OLIVER, SMITH, MANTZ, and MULRONEY, JJ., concur.