J. E. HENG, appellee, v. M. J. HENG et ux., appellants.

No. 48200.

(Reported in 56 N.W.2d 484)

JANUARY 13, 1953.

Paul A. Black and Burnstedt, Hemingway & Hemingway, all of Webster City, for appellants.

L. W. Powers, of Denison, for appellee.

OLIVER, J.—This case involves a house and lot in Jewell Junction, Iowa, occupied by plaintiff as his home since 1938. Plaintiff, now about sixty-nine years of age is a laborer who apparently has had little formal education or business experience. The defendants are plaintiff's son, Marion J. Heng, and Marion's wife, Edna.

In 1938 the family in plaintiff's home in Jewell Junction consisted of plaintiff, his wife, twin sons Richard and Robert age fifteen, a daughter age twenty and defendant Marion who was then about twenty-four years old. The house they occupied as tenants had been sold and they were looking for another house. It was learned the house and lot here in question could be purchased for $1150, payable $300 down and balance at $10 per month. Plaintiff had been working on W. P. A. projects and at odd jobs from about 1933 to 1938 and had only recently returned to his former employment with a lumberyard. He had no money for the down payment. Marion made the $300 initial payment (plaintiff testified it was a loan) and was the purchaser named in the contract of sale which was executed in September 1938. The twin brothers testified (denied by Marion) that this $300 was furnished by them. One of them testified the title was taken in Marion's name because he was the only child at home of legal age "and Dad had never had any legal transaction in his life * * *."

In October 1941, the seller conveyed the property to Marion. The unpaid balance of the contract price, $550, was furnished by a local bank on a note payable in $10 monthly installments, signed by Marion, endorsed by plaintiff and wife and secured by a mortgage on the property.

In 1941 Marion left the home and attended a chiropractic college one semester. Later in that year he joined the Navy. He was married in 1942. After his discharge from the Navy in 1945 he continued his chiropractic study. Subsequently he practiced that profession. His wife and he visited in the family home for a few months in 1945 and 1948. In 1950 he returned to Jewell Junction. Since then he and his family have occupied part of the home.

In this suit, instituted in June 1951, plaintiff alleged defendant Marion loaned him the $300 to make the initial pay-

ment on the home and took title to the property as security for the loan; that since then, Marion had become indebted to plaintiff for more than that amount for board and room and for money advanced by plaintiff to pay life insurance premiums for Marion; that Marion had no interest in the property except for such amount as the court should find plaintiff owed him after deducting credits and offsets. Plaintiff prayed that the property be ordered conveyed to him upon payment of such amount.

The answer denied the foregoing allegations, alleged Marion purchased, paid for and owned the property and prayed his title be quieted against plaintiff's claim. The trial court found plaintiff was the real purchaser of the property; that Marion entered into the contract for the use and benefit of plaintiff, using $300 borrowed from the twin brothers, and holding the legal title as security for the down payment and for the benefit of plaintiff who treated the property as his own and made substantial improvements thereon with the concurrence of Marion; that plaintiff and his wife had repaid $150 of the $300 advanced for the first payment on the property; that there was due Marion $150 with interest, and plaintiff was entitled to a conveyance of the property upon payment of said amount to the clerk of the district court. Judgment was rendered accordingly. Defendants have appealed.

I. "It is well established that where one purchases land and borrows all or part of the purchase price from another, the title may pass directly to the one who furnishes the money, as security for such loan. The purchaser may show by parol that the title is held by the third party as security for the advancement." Davis v. Wilson, 237 Iowa 494, 499, 21 N.W.2d 553, 557. Among other authorities are Brown v. Hermance, 233 Iowa 510, 514, 10 N.W.2d 66, 68; Osborne v. Osborne, 196 Iowa 871, 195 N.W. 586; Jones v. Gillett, 142 Iowa 506, 118 N.W. 314, 121 N.W. 5; 54 Am. Jur., Trusts, section 210; Restatement of the Law, Trusts, section 448.

It is the rule that the burden is upon the party claiming the title to be held as security, to establish it by clear, satisfactory and convincing evidence. Reusch v. Shafer, 241 Iowa 536, 546, 41 N.W.2d 651; McKenney & Seabury v. Nelson, 220

Iowa 504, 507, 262 N.W. 101; Brown v. Hermance, 233 Iowa 510, 514, 10 N.W.2d 66, 68. We do not understand the parties disagree as to the foregoing legal propositions. The basic question is whether plaintiff's case has been established as required by the above rule.

II. Marion's testimony is in conflict with that of other members of the family. Plaintiff testified he made the monthly payments on the contract during the three years it was in effect. Marion testified he made all the payments from 1938 until he left Jewell Junction in 1941 and that he was paid $15 per month by tenants who occupied the upstairs of the house. Mr. Rorem, an officer of the local bank, testified: "We acted as agent for J. E. Heng [plaintiff] when the house was purchased. I mean by agent he bought the house from Mr. Ness, he made all the arrangements with Mr. Ness. * * * I can't recall that I talked to Marion. * * * We did receive some payments between 1938 to 1941. The payments were from J. E. Heng [plaintiff]." Mr. Rorem testified also that plaintiff arranged with him for the $550 loan from the bank to pay out the contract and that the bank expected plaintiff and his wife, who endorsed the note signed by Marion, to pay the note. Plaintiff paid the note.

A letter from Mr. Ness to plaintiff, evidently written in 1941, states he received a deed from Mr. Rorem for him (Ness) and his wife to sign and requests plaintiff to "look over carefully the duplicate of contract for deed which you have. * * * It could not be possible that $1450 was the sum that you agreed to pay? * * * I have also looked over my book again and come to the same figure as already sent you—with the exception of a check for $10. The other check of $20 I found this evening and it is not cashed. * * * As to that $10 check—if you have it, it might have been cashed by my wife as all the checks have been in her name. [The contract was in her name.] Enclosed you will find my figures—* * *. If you have the returned checks you can easily find out if there is a mistake. Until we agree * * * I am unable to state how much you owe me at this time. So you go to the bank with your papers and compare with mine and ask Mr. Rorem to figure out the interest."

Plaintiff made substantial improvements to the property, costing about $2400. Some of these were: Insulation $402, furnace and cold air registers $278, water heater $140, wiring $75, sidewalks $125, rebuilding and reroofing $470. Plaintiff's expenditures for improvements are inconsistent with Marion's claimed ownership of the property. One in the financial situation of plaintiff does not ordinarily make such substantial permanent improvements to the property of another. Marion testified he paid $10 for a soft water pump in 1939, and about 1944, from overseas, sent his parents $100 to buy venetian blinds. There was evidence indicating the value of the property increased to about $6000. It would appear much of this increase was due to the improvements made by plaintiff. Marion testified he paid the insurance on the house, and that the payments by plaintiff to the bank and taxes were as rent and the improvements were upkeep.

A witness testified Marion in 1947 told him they made a down payment of $300 on the house, that "the plan was to turn it to the folks when it got paid for and they paid him back, but so many things had happened in the meantime that made them change their mind."

Plaintiff claimed an offset of several thousand dollars for board, room, etc., furnished Marion during the five or six years Marion lived in the home after he attained his majority. Marion did not directly deny this claim. He testified merely, "I did not pay any stipulated amount for board when I stayed home." Another offset claimed by plaintiff was $48 for premiums on Marion's life insurance. The trial court did not allow these offsets. We do not suggest this was incorrect. However, the evidence indicates that whatever Marion may have paid for insurance on the house, venetian blinds, etc., was many times offset by what he received from plaintiff after he (Marion) attained his majority.

While Marion was in the Navy after his marriage, his mother became concerned because the title to the property was in his name. At that time he wrote a letter stating the house would go to his parents, if anything should happen to him overseas. As time passed the concern of Marion's mother over the title increased. Plaintiff testified he offered to repay the

loan when Marion was home on furlough in 1945 but Marion did not want to take it. In 1947 Marion prepared to deed the property to his wife. Marion's mother, who apparently knew or believed the twin brothers had advanced defendant the $300, paid one of them, Robert, $150 which the latter forwarded to Marion. The trial court allowed plaintiff credit for this payment. Marion's mother died in 1951 shortly before this suit was instituted.

The record contains much other evidence which, although not discussed here, has been considered. Upon this appeal the case is triable de novo and the findings of the trial court, who saw and heard the witnesses, are entitled to substantial weight. Although some of the evidence is conflicting, our consideration of the printed record and the findings of the trial court lead us to conclude plaintiff's case has been established by clear, satisfactory and convincing proofs.—Affirmed.

All JUSTICES concur.