F. A. CLARK, Appellee, v. BIRDIE V. CHAPMAN et al., Defendants; LEWIS V. BOUDINOT et al., Appellants.

No. 41122.

DECEMBER 17, 1931.

Gillespie & Moody, for appellants.

J. A. Merritt, for appellee.

EVANS, J.—The mortgage in suit was made January 5, 1928, and was for $8300. The mortgaged property consists of about two acres of ground, divided into many lots, and situated upon East 14th Street in the city of Des Moines. It comprises two residence houses, one of which was, at the time of the conveyance, occupied by the Boudinots as a homestead, and the other was rented to a tenant. This occupancy was begun by Lewis V. Boudinot and his then family in 1917. Prior to the year 1924 his wife died, survived by her husband and two children. In 1924 Boudinot married his present wife (Genevieve) and has continued to occupy the property with his family since that time. In December, 1926, this husband and wife conveyed this property, including both houses, to Birdie V. Chapman (sister of Lewis V. Boudinot), by a warranty deed with full covenants, subject, however, to liens of record. While holding the title thus conveyed, Birdie V. Chapman and her husband executed the mortgage in suit. There was no controversy or friction of any kind between the Chapmans and the Boudinots, either prior to, or since, the execution of the mortgage. They all testified that they acted in good faith in the negotiation and delivery of said mortgage. If they have since been guilty of bad faith, it is not as against each other, but against the plaintiff, and jointly. The contention of the Boudinots now is that the warranty deed was intended as a mortgage, to secure a debt owing to Birdie V. Chapman; that there was no intention on the part of the Boudinots to part with their homestead rights; that by the continued possession of the property they maintained their homestead rights; that the mortgage in suit was void as to them because they did not sign the same.

It appears on behalf of plaintiff that Chapman, the husband of Birdie, solicited this loan from the plaintiff, and that Boudinot was with him when he did it. Chapman represented to the plaintiff that his wife was the owner of the property. This was done in the presence of Boudinot, as the latter testified.

740

The plaintiff went with them to view the property. Boudinot conducted him through the house which he was occupying. The other tenant conducted him through the other house. By this conduct the plaintiff was led to believe, and did believe, that Boudinot was the tenant of his sister on this property and that the other was tenant of the same purported owner. Upon the trial herein, Boudinot testified that he was not the tenant of his sister, but was in control himself of both properties, and collected rent from the other tenant.

Ignoring some of the facts herein suggested, the defendants contend broadly that they never parted with their homestead right, and that in some way they reserved it, and that it is superior to any rights accruing either to Birdie V. Chapman or to her mortgagee.

. Concededly it is open to a grantor to prove that his warranty deed was intended as a mortgage. The proof, however, of such a contention must be clear and convincing. At this point we defer the consideration of that issue, and consider first another feature of the case. For that purpose, and for the moment, we assume as true the following testimony of Mrs. Chapman as a witness for the defendants:

"Q. You tell in your own words what the agreement was at the time you took that deed. A. My brother owed us about $1800.00, and his health was not good, and so he wanted to secure us, and *his banker* advised him to secure us, and he *trusted me in the belief* that if anything should happen to him that I would care for the rest of the property *for his children,* what was left of it, and that is the way it was. Q. *If Mr. Boudinot paid you* the indebtedness which he owed you and your husband, what were *you going to do?* A. To deed it back."

It may be laid down as a self-evident proposition that the rights conferred upon Clark by the Chapman mortgage were at least equal to the rights conferred upon Birdie V. Chapman by the warranty deed. The evidence discloses that the property was incumbered for $8300, and that the purpose of the loan negotiated with the plaintiff was to meet that incumbrance, which had matured. The transaction was closed at the Peoples Savings Bank, where the other incumbrance was held. The

plaintiff's check was turned in by the parties to the Peoples Savings Bank, and the previous mortgage was cancelled and delivered to the plaintiff. Not a dollar of the proceeds of the loan was diverted to any other purpose than to take up the existing incumbrance and thereby to conserve the property. Boudinot was present at this closing transaction. But even if he were not present, and even if he knew nothing about it at that time, could he challenge the transaction as against his sister and repudiate the right in her to effect this change of creditors or mortgagees for the purpose of conserving the property? If she had a claim upon her brother for $1800, it was nevertheless inferior to the existing mortgage. Her claim could not be saved to her out of the property unless she first paid the prior lien. If she had paid the lien out of her own funds, could Boudinot challenge her right to reimbursement? These questions quite answer themselves. The fact that there was an existing mortgage upon the property and that the loan from plaintiff was made for the purpose of discharging it and that it was thus discharged, is entirely ignored in appellant's opening argument. The question is met in the reply argument by the statement that:

"Nowhere in the record is there any testimony that the appellant Genevieve Boudinot ever *signed any mortgage or deed* other than the mortgage which was signed in favor of Birdie V. Chapman."

Mrs. Chapman testified:

"Q. And you knew Mr. Clark was furnishing the money? A. Yes. Q. You was present up at the bank, were you, at the Peoples Savings Bank, when he turned the money over? A. Yes. Q. He turned over $8,300.00 and then that was used to pay off the incumbrances on the place? A. Yes."

Boudinot testified:

"Q. Was there anything said there by the Chapmans while you were present about how much money they would have to have? A. Yes. He told him he would have to have around $8,000.00; the loan was $8,000.00, and that he would have to have a little better than that. Q. It was going to take up another mortgage loan that you had made before you deeded it to Birdie? A. I presume so."

The plaintiff testified in substance that the contemplated loan was to be for $8000, but was increased to $8300 because such an amount was necessary to discharge the existing mortgage. The denial in appellant's reply brief that there was any mortgage *which had been signed by Genevieve* is inconclusive. At the time the deed was made to Mrs. Chapman, the marriage of Genevieve was comparatively recent. Her husband had owned the property since 1917. If the existing incumbrance antedated the marriage, it was no less valid and enforceable because of the marriage. The marriage imposed no infirmity upon existing mortgages. Appellants make this further response in their reply argument:

"Appellants deny that there was a mortgage on the property which was a valid lien against the appellants' homestead, and appellants state that there has never been a mortgage *against the homestead* which could be validly enforced against it."

This denial presents only a legal conclusion, and is predicated wholly upon the mere absence of data from the record. The burden was upon the appellants, and not upon the appellee. The evidence shows that all the parties treated such mortgage, at all times prior to this suit, as valid and enforceable. That of itself is quite sufficient for our present consideration.

It is plain to our minds that, if Birdie V. Chapman had paid off the existing mortgage, she would have been entitled in equity to reimbursement. Nor would she be entitled to any less if she were to discharge the present judgment entered against her in favor of the plaintiff. And this is so on the theory of her testimony above quoted. The indications of the record are that she and her husband are safely insolvent and are quite fearless of the judgment. As witnesses, they have lent their aid freely to their brother. The right of plaintiff, as mortgagee under Mrs. Chapman, is quite equal to what her own rights would have been if she had advanced the funds herself.

Under the facts herein disclosed, plaintiff would have been clearly entitled to the remedy of subrogation, if he had asked it. That remedy doubtless would have furnished the simplest solution of the problem. Nevertheless the facts which would have justified such remedy are equally effective to repel the affirmative defense pleaded by the defendants.

II. Is the evidence sufficiently persuasive to support the contention that the warranty deed was intended only as a mortgage to secure $1800? An important burden of proof rests upon the appellants at this point. Only clear and satisfactory evidence can be accepted to warrant the conversion of a warranty deed into a mortgage security. It was incumbent upon the defendants to prove in such manner: (1) That the consideration for the warranty deed was an existing indebtedness, together with the amount of such indebtedness; and (2) that such indebtedness was not extinguished by the conveyance, but was kept alive. We have already quoted in the preceding division hereof the evidence of Mrs. Chapman on this subject. Boudinot testified as follows:

"Q. What was the purpose of the execution of the deed? A. To secure them for some money that I owed them. Q. Secure them? A. My sister and brother-in-law, her husband. Q. How much did you owe your sister? A. About $1,800.00. Q. What was the agreement you had with Birdie V. Chapman at the time you made the deed to her? A. She was to deed it back to us *in case we paid her.*"

Chapman, the husband, testified as follows:

"Q. Do you remember what the agreement was with Mr. and Mrs. Boudinot with reference to these properties? A. Why, yes, she was to deed the place back to him when he paid the balance he owed. What he owed, I think was $1,800. A note that we had paid at the bank and the other bill that he owed me amounted to about $1,800."

The foregoing constitutes the entire evidence on this pivotal question. The existence of an eighteen hundred dollar debt is not ordinarily difficult of satisfactory proof. It is unlikely it could exist without some written evidence of it. If the indebtedness was the consideration for the warranty deed, then it was presumptively extinguished by the delivery of the deed. If otherwise, then the evidence of the debt must be in existence. Presumably the note, if any, would be drawing interest, and would be protected against the running of the statute of limitations. Under the testimony in this record, each witness testified to the *amount* of the note only as a matter of approximation.

Why should the amount of the note be *guessed* if the note itself is in existence? No reason is suggested in the record why the note was not offered in evidence or produced. Sufficient to say at this point that the evidence as to the existence of the indebtedness at any time, and especially at the present time, is not clear and satisfactory. If the indebtedness ever existed, and if no note representing it is in existence at the present time, then inferentially it was extinguished by the conveyance of the property. The testimony, such as it is, fails to show that Boudinot was under any obligation to pay the alleged debt which formed the consideration of the warranty deed.

As against this frail evidence, we may consider the conduct of the parties as indicating their mutual understanding. As already indicated, all of them testified to their good faith in their dealing with the plaintiff. We may fairly accept their statement in that regard. Their conduct, however, was contradictory to their present testimony. They all declared in effect that Mrs. Chapman was the owner of the property. The mortgage, which was signed, recited such fact definitely. Under their present contention she was not the owner of the property. If she was not the owner of the property, her negotiation of the mortgage was a fraud, both upon her brother and upon the plaintiff. It could not have been a fraud upon her brother, because he was active in the negotiations with the plaintiff. If the present contention be true, then Boudinot himself perpetrated a fraud upon the plaintiff. Taking their conduct, therefore, as it appears from their own testimony, as the truer indication of what their understanding was as between themselves, it must be said that they regarded the deed as an absolute conveyance.

III. Furthermore, let us assume for the moment that there was an oral reservation amounting to an equitable title binding upon the grantee. Did the plaintiff have notice of it? The argument for defendants is that their possession was notice of their rights. The legal proposition is sometimes so put in the books. It is not quite accurate as applied to all cases. Possession is ordinarily sufficient notice to put the purchaser *upon inquiry*. If the purchaser ignores the possession and fails to inquire, then he is charged with notice of such facts as an inquiry would have discovered. The rule under consideration is intended to bring to the party in possession full knowledge of

pending negotiations, whereby he may assert his rights and impart notice to a proposed purchaser. When that opportunity is withheld from him, then his possession is deemed notice of all facts which he would have imparted if inquiry had been made. The rule has no function under the evidence in the present case. Boudinot and Chapman acted jointly in their application to the plaintiff. They *asserted* the ownership of the property to be in Mrs. Chapman, the wife of one and the sister of the other. Having imparted to him that information, they brought him to the property. Boudinot conducted him through the house in which he lived. At this point it is urged by the appellants that the plaintiff did not *"inquire"* of Boudinot what his rights were. This was a reason given by Boudinot, as a witness, why he did not tell him. This rule of law does not rest upon a merely categorical question and answer. In their first negotiations with the plaintiff they had anticipated all inquiries on his part on that subject. When they told him that Mrs. Chapman was the owner, he accepted the statement and relied on it. They knew that he was relying on it. Was he bound to distrust the statement and to cross-examine them upon it? Manifestly not. When the assertion of Mrs. Chapman's ownership was made to plaintiff in Boudinot's presence, for the very purpose of acquiring a loan upon the property, Boudinot became under duty to speak, if he believed the fact to be as he now claims. The legal effect of this circumstance is not so much that it operates as an estoppel, but that it operates as a *performance* by the plaintiff of whatever duty he owed to the person in possession. Having performed that duty, and having failed thereby to elicit any warning from the party in possession that indicated any infirmity in the title of the proposed mortgagor, he is entitled to stand as a purchaser for value without notice. We hold at this point that the acts and attitudes of all the defendants clearly indicated their mutual understanding that there was no infirmity in the title of Mrs. Chapman; and that they imparted no notice or warning to the contrary.

■ IV. Up to this point we have assumed, for the purpose of the discussion, that the possession of the property by Boudinot was sufficient of itself to put the plaintiff upon inquiry and to charge him with notice of all facts which such inquiry would have discovered. We now revert to the question whether such

possession was effective to that end, and whether the rule of notice under consideration has any application to the grantors in a warranty deed who hold over after the execution and delivery of such deed. In McClenahan v. Stevenson, 118 Iowa 106, and later in Luckhart v. Luckhart, 120 Iowa 248, we held that a grantor in a warranty deed who continues to hold possession after the delivery of his deed is presumptively deemed to hold the same in subordination to the deed, and not in hostility thereto. The alleged possession, in order to constitute notice, must be in fact an adverse possession and hostile to the holder of the record title. In the McClenahan case (p. 112) we said:

"In such cases a grantor in possession is presumed, in the absence of a contrary showing, to be holding in subordination to the title of his grantee. McNiel v. Jordon, 28 Kan. 7. Of course, such a grantor may acquire title by adverse possession, even as against his warranty deed; but he must explicitly disclaim holding under his grantee, and openly assert his title in hostility to the title claimed under his own previous deed. Knight v. Knight, 178 Ill. 553 (53 N. E. Rep. 306) ; Stearns v. Hendersass, 9 Cush. 497 (57 Am. Dec. 65). But the mere fact that the grantor and his heirs remain in possession, enjoying the property in the same manner as they did before the conveyance was made, does not bind the grantee with notice of an adverse claim. Hennessey v. Andrews, 6 Cush. 170; Van Keuren v. Railroad Co., 38 N. J. Law 165; Paldi v. Paldi (Mich.), 47 N. W. Rep. 511; Ivey v. Beddingfield (Ala.), 18 South. Rep. 139; Evans v. Templeton, 6 S. W. Rep. 843 (5 Am. St. Rep. 71). Of course, if the grantor and his heirs remain in possession for the statutory period, openly claiming the land as their own, and this claim is made known to the grantee, either expressly or by implication, title may be acquired through such possession. Meeks v. Garner (Ala.), 8 South. Rep. 378 (11 L. R. A. 196) ; Knight v. Knight, supra. But he must openly claim the land as his own, and not under or by the permission of his grantee. The presumption, as elsewhere stated, always is that a grantor who remains in possession holds without claim of right, and by sufferance of his grantee."

The foregoing pronouncement was reaffirmed in the Luckhart

case. In each of the cited cases, the grantor had continued in possession for many years after the delivery of his deed.

It was therefore incumbent upon the Boudinots not only to show their continued possession, but to show also that such possession was openly hostile to Mrs. Chapman. If the defendants in their possession recognized their subordination to Mrs. Chapman, as their grantee, then such possession could not be deemed hostile to her mortgagee. Otherwise the Boudinots could render the property immune from their own debts, by the execution of their warranty deed, and further immune from the debts of Mrs. Chapman by oral reservations wholly concealed from the public eye and wholly withheld from the public ear.

 V. Though the defendants Boudinot claim the mortgage to be invalid as to all the mortgaged property for want of authority to execute the same, yet the emphasis of their contention is directed to the homestead. Notwithstanding the execution of the warranty deed, they claim that in some way they carved out and reserved to themselves the homestead right. Manifestly there can be no homestead right without ownership, legal or equitable, of the homestead property. If their contention could be sustained as against their grantee, that their warranty deed was intended as a mortgage only, then they would be the equitable owners of the property, and their right to homestead could be predicated on such ownership. But even so, their right of homestead would not become superior to their alleged mortgage, nor superior to the rights arising thereunder, nor superior to the existing liens, nor superior to the rights of mortgagees or purchasers from Mrs. Chapman, for value without notice. For the purpose here indicated, the warranty deed, duly signed by both husband and wife, was a complete subordination and waiver of all the rights of both husband and wife, including homestead and dower. Code Section 10051. That is to say, if they had successfully retained, by oral reservation, an equitable ownership upon which the right of homestead could be predicated, yet such equitable ownership would be subordinate to the power conferred by the warranty deed upon its grantee.

 Appellants rely upon one circumstance as being sufficient evidence of the reservation and of notice thereof to the appellee. The deed was duly recorded. The public record thereof was put in evidence. It appeared therefrom that the recording

of the deed was done by copying the same into a blank form upon a page of the public record. The printed portion of this blank form upon the record in its original condition included language by which a wife affirmatively relinquished all right of dower and homestead. The word "homestead" was erased upon such form. It is contended by the appellants that this erasure upon the record is evidence that the same erasure or alteration was made upon the deed itself; that therefore the erasure operated as a reservation of the homestead, and as notice to the plaintiff of such reservation. The point is clearly untenable. If such an erasure upon the deed itself could operate as an affirmative reservation contradictory to the covenants of the deed, then the deed itself should have been produced and offered in evidence. It was not produced. The erasure on the printed form of the record was no evidence that a like erasure existed upon the deed. The erasure upon the record may have been made in conformity to the original condition of the printed form of the deed, and thus we must presume, in the absence of a showing otherwise. Moreover, the erasure of such word, even though it were made in the deed itself, could have no legal effect whatever. It was entirely immaterial whether the word "homestead" was included or not, in the recitals of the deed. Whether included or omitted, the legal effect of the conveyance was the same.

The district court entered decree for the plaintiff. Its decree is accordingly—Affirmed.

FAVILLE, C. J., and MORLING, KINDIG, and GRIMM, JJ., concur.