In the Matter of Glenn HEMPHILL and Norma Hemphill, Debtors.

Glenn HEMPHILL and Norma Hemphill, Plaintiffs,

v.

T & F LAND COMPANY, a corporation; T. C. & J. Grain Company, a corporation; Triple F Farms, a partnership; C & J Farms, a partnership; Tony Freund, Sr.; Charles Freund; John W. Freund; and Tony Freund, Jr., Defendants.

Bankruptcy No. 80–1671–W.
Adv. No. 80–0210.

United States Bankruptcy Court,
S. D. Iowa.

Jan. 22, 1982.

Maureen E. McGrath and Terrence J. Ferguson, Kutak, Rock & Huie, Omaha, Neb., for plaintiffs.

Frank H. Kulig, Venteicher, Strasheim & Laughlin, P. C., Omaha, Neb., Robert J. Baudino, Jr. and Donald F. Neiman, Des Moines, Iowa, for defendants.

Frank W. Pechacek, Jr., Council Bluffs, Iowa, for creditors' committee.

Charles L. Smith, Council Bluffs, Iowa, for debtors.

## MEMORANDUM OF DECISION

RICHARD STAGEMAN, Bankruptcy Judge.

This is an adversary proceeding to avoid the transfer of certain land and chattels. The legal bases of the action are Sections 547 and 548 of the Bankruptcy Code (11 U.S.C. §§ 547, 548), the common law of Iowa relating to fraud, reformation and rescission of contracts, and failure of consideration. The plaintiffs, Glenn and Norma Hemphill seek the return of the subject matter land and chattels, money damages and general equitable relief.

The plaintiffs are husband and wife. They are also debtors under a jointly filed Chapter 11 bankruptcy case. The order for relief was automatically entered October 14, 1980.

The plaintiffs reside near Griswold, Iowa, where for some years past they owned and operated a seed and grain sales and storage business, raised swine for market, and farmed. Part of these agricultural pursuits were conducted in the Iowa corporate name Hemphill Seed and Grain, Inc. ("H.S.&G."). The land used by H.S.&G. was leased from the plaintiffs.

The defendants, Tony Freund, Sr., John W. Freund, and Charles Freund are partners in an Iowa farm partnership, Triple F Farms, also a defendant. The defendants, John W. Freund, and Charles Freund are partners in an Iowa farm partnership, C&J Farms, also a defendant. Tony Freund, Jr., the son of Tony Freund, Sr., and brother to Charles and John W., also farms. The Freunds are the owners of defendants T.C.&J. Grain Company ("T.C.&J.") and the T&F Land Company ("T.&F.L."), Iowa corporations.

On March 3, 1981, the official creditors' committee was authorized to intervene as an interested party plaintiff.

The issues raised in this proceeding center on a transaction between the plaintiffs and defendants relating to 120 acres of farm land, the facilities and personal property used in the plaintiffs' seed and grain sales and storage business, and the facilities and personal property used in the swine raising business. ("Land & chattels").

These businesses and a general grain farming operation grew from a modest start in the mid 1960's. They represent a commitment of years of labor and a substantial portion of the accumulated fortune of the plaintiffs, farmers from farm families.

In 1974, the plaintiffs formed H.S.&G., and then leased the land to H.S.&G. H.S.&G.'s operations were adjacent to Griswold, Iowa, on the south.

The storage capacity of the H.S.&G. grain elevator was comparatively small. In order to handle the amount of corn grown in the immediate area it influenced the elevator pre-sold corn harvested at a later date which allowed an immediate shipment

directly to other terminals without being stored in H.S.&G.'s facilities.

H.S.&G. also bought and sold market and seed soybeans under agreements that did not call for storage. H.S.&G. would contract for the future bean crop of a farmer at planting time. There were "seed grower contracts," carrying a 40 cent a bushel premium, whereunder the farmer delivers the soybeans contracted for at a price to be fixed at such later time as the farmer chooses. Under this arrangement the elevator obtained title to the beans and was free to sell them when delivered.

H.S.&G. also bought grain for immediate resale under "deferred price contracts" whereunder the farmer seller could defer pricing his grain to a later date, and hopefully higher price, even though it was presently delivered and sold.

In order to protect itself against a rise in grain prices which must be paid after the elevator has sold grain purchased under seed grower and deferred pricing agreements H.S.&G. "hedged" its position in the market by purchasing futures contracts on the Chicago Board of Trade. H.S.&G. with obligations to pay a present market price higher than the price it had earlier received for grain could offset the impending loss by selling its own futures commodity contracts at the same time and higher price level.

In 1979, circumstances conspired to bring H.S.&G. down, the limited storage capacity, the large amounts of cash needed to maintain positions in commodity futures, a good crop year calling for greater expenditures on deferred price contracts, and an irregular grain market. Farmers needed cash because agricultural credit was tight. H.S.&G. did not have a cash reserve. The result was that H.S.&G. ran out of cash.

In the spring of 1980, H.S.&G. issued over $500,000 in "no funds" checks to meet grain contracts and other obligations. The Oakland Savings Bank refused to grant H.S.&G. any further credit. On May 30, 1980, the Iowa Commerce Commission ("I.C. C.") temporarily suspended H.S.&G.'s grain dealers and warehouseman's licenses because H.S.&G.'s net worth had fallen below the required statutory level of $25,000. A hearing on whether the suspension should be made permanent was set for July 8, 1980, before the I.C.C.

H.S.&G. closed down and the plaintiffs searched desperately for a source of credit to save the business.

A broker brought in the Certified Public Accounting firm of Touche Ross & Co. The accounting firm first suggested a sale of H.S.&G.'s assets and a lease-back to the plaintiffs or their company. Attempts to find interested investors failed.

The plaintiffs next consulted one Willis Mouttet, a part time minister, self appointed financial advisor and proven bad risk. Mouttet considered himself knowledgeable in the structuring of financial rehabilitations by means of sale and lease-back arrangements. He undertook the task of saving H.S.&G. for an initial fee of $15,000.* Mouttet first tried to generate interest in H.S.&G. among the company's former creditors. This proved fruitless.

The plaintiffs tried capitalizing $1,357,-596.74 in accounts of H.S.&G. due them personally, $500,000 in debts due farmers they personally assumed, and $855,000 in direct obligations of H.S.&G. They also transferred 120 acres of farm land to H.S.&G. Even these measures did not raise the net worth of H.S.&G. to the $25,000 required by law.

By mid-July 1980, the plaintiffs needed $250,000 in immediate cash to hedge "short positions" in commodity contracts. On July 14, 1980, Mouttet asked the defendants if they would loan the plaintiffs $250,000 secured by a second mortgage on the elevator. The defendants were friends of the plaintiffs and had done business with H.S.&G. H.S.&G. owed the defendants approximately $226,000, so the defendants had a direct personal interest in the survival of H.S.&G.

The defendants rejected the idea of a short term loan because of the possibility that the defendants themselves might end

---

* He was ultimately paid $46,500.

up in bankruptcy. Before the defendants would venture $250,000 they wanted to talk to a bankruptcy specialist. They consulted Jerrold Strasheim of the Omaha law firm of Marer, Venteicher, Strasheim, Seidler and Laughlin. Charles Freund, Mouttet and Strasheim met on July 21, 1980, in Strasheim's office. Strasheim advised the defendants against a loan secured by a mortgage because the terms of a mortgage could be modified under the "cram-down" provisions of the Bankruptcy Code in the event of bankruptcy. Strasheim suggested a "buy-sell" arrangement with an option to repurchase. Such a transaction would protect the defendants from the "cram-down" features of the Bankruptcy Code. The defendants agreed to the concept of the "buy-sell" and repurchase option.

A Mr. Kulig of Strasheim's firm, present counsel for the defendants, drafted all the documents that made up the agreement of the plaintiffs and defendants. Mr. Kulig's documentation of the parties' agreements consisted of 47 tightly drawn pages of undertakings and conditions. They were delivered to a Mr. Howe who was representing the plaintiffs before the I.C.C. Mr. Howe delivered the documents to a Mr. Chabot for his consideration. Neither Howe or Chabot took part in the negotiations that resulted in the agreements they were being asked to examine and weigh as lawyers.

On July 31, 1980, Howe, Chabot, Glenn Hemphill and Mouttet met to consider the proposed agreement. Howe and Chabot advised Hemphill that he should not sign the contracts. Their principal concern was that the defendants would be unable to meet the stringent conditions of the option to repurchase their property and they could lose it all. The best they could do to protect the plaintiffs was to talk Glenn Hemphill into waiting until after August 4, the date the I.C.C. was to decide whether H.S.&G. could regain its licenses.

If H.S.&G. lost its license permanently, Howe felt it was unlikely that Glenn Hemphill would be granted a license or even allowed to manage a licensed business. If that were correct the plaintiffs could not meet the conditions of the sale, lease-back, repurchase agreements that would allow the redemption of the lands and chattels from the defendants.

It may be that Mouttet convinced Glenn Hemphill that the plaintiffs had a better chance before the I.C.C. if the agreement with the defendants was already signed when the August 4 hearing was held, or it may be that Hemphill was under such financial pressure and so anxious about his businesses that he improvidently ignored his own legal advisors and took the only course he felt was still open. It was probably a combination of the two that compelled the plaintiffs to sign Kulig's contracts on August 1, 1980, in the office of plaintiffs' local attorney. The plaintiffs' attorneys who had reviewed the documents were not present, although some modifications that Mr. Chabot had suggested by telephone to Mr. Kulig's secretary were accepted.

The so-called "buy-sell" agreement was in form a sale, lease-back and option to repurchase package. The defendants would form T.&F.L. which would buy the land and chattels from the plaintiffs after the plaintiffs obtained the chattels from H.S.&G. for $500. The consideration in round numbers amounted to $817,000, consisting of $250,-000 cash, cancellation of $226,000 of debt H.S.&G. the plaintiffs, by assignment, owed the defendants, and T.&F.L.'s assumption of a $341,000 first mortgage on the land held by Federal Land Bank.

T.&F.L. would lease the land and chattels to defendants' newly formed T.C.&J. The lease payments were computed to correspond to 14% return of the defendants' cash investment of $476,000 ($250,000 and $226,-000), and the $341,000 first mortgage assumption.

T.C.&J. subleased the land and the swine operation back to Glenn Hemphill. T.C.&J. would retain the elevator facilities.

T.C.&J. would operate the elevator, provide the requisite I.C.C. licenses, and provide $30,000 of the $250,000 cash consideration to provide T.C.&J. with the required capital net worth, an I.C.C. condition for licensing.

T.&F.L. granted T.C.&J. an option to purchase land and chattels for $375,000 and a $100,000 secured two year promissory note from T.C.&J. to T.&F.L. bearing interest at 2% over the prime rate charged by a certain Omaha bank, and the assumption of all of T.&F.L.'s secured debt. The option to repurchase called for $500 a month payments and had to be exercised on or before November 30, 1980, or thereafter on month to month extensions to not later than July 31, 1981, also at monthly payments of $500. The option contained stringent conditions permitting automatic cancellation.

[I]f any payment required under this option is not paid promptly when due; if that certain Management Agreement dated contemporaneous herewith by and between T.C.&J. and Glen Hemphill is terminated for any reason; on the occurrence of any event of default under the terms and provisions of that certain Farm Lease between T & F as Landlord and T. C. & J. as Tenant dated contemporaneous herewith covering the above-described real and personal property; upon T. C. & J.'s abandonment of any portion of the property described herein; or upon any assignment or transfer of this option or any interest therein. (Para. 7, p. 3.)

T.C.&J. entered into a "Management Agreement" with Glenn Hemphill to manage T.C.&J. The management contract also contained its share of stringent conditions the breach of which meant an automatic termination.

5. The Owner shall have the right to terminate this Management Agreement including the Stock Option set forth above for cause, including without limitation, evidence of dishonesty on the part of the Manager or Manager's acquiescence in the dishonesty of other employees, salesmen, customers or other third parties; insubordination; failure to carry out the directives of the Owner; failure to have the Business opened and operating during all regular business hours; violation of any government law, statute, ordinance, regulation or rule which could result in the loss or suspension of Owner's operating license or other business licenses and permits occurring as a result of Manager's negligent or intentional acts or omission; loss or destruction of Owner's property caused by Manager's negligent or intentional acts or omission; Manager's arrest for any crime punishable by more than ninety (90) days in jail, or conviction of any crime resulting in Manager's incarceration for any period of time, or Manager's ineligibility to be employed by a licensed grain elevator; breach of any of the provisions of this Management Agreement; speculative trading on behalf of the Business or with Business assets in any commodity, or contracts for the purchase or sale of commodities or any other commodity trading engaged in on behalf of the Business or with Business assets not in accordance with 'sound business practices;' refusal by the Iowa Commerce Commission to issue or renew, or action by such commission revoking or suspending temporarily or permanently any grain dealer and warehouse license or other necessary license or permit; or if any of the warranties or covenants contained in the Purchase Agreement between Owner, as Buyer, and Manager as Seller dated contemporaneous herewith; or any other document given in connection therewith are breached or proves to be untrue (provided that the foregoing right of termination may be exercised without prejudice to all other rights and remedies which Owner may have at law or in equity against Manager under such Purchase Agreement or any instrument or document executed in accordance with the terms thereof).

Glenn Hemphill was granted an option to purchase the capital stock of T.C.&J. for $10,000 in the event T.C.&J. exercised its option to purchase the land and chattels from T.&F.L.

The funds generated from after taxes net profit by T.C.&J. were to be escrowed to meet operational expenses and, if needed, applied on the option price to redeem the land and chattels from T.&F.L.

It was anticipated that a corporation named Valley Seed and Grain Company would be formed for the purpose of allowing the creditors of H.S.&G. to exchange their claims for redeemable preferred stock. After the land and chattels of the plaintiffs were redeemed from T.&F.L. the elevator profits would be used to redeem the preferred stock of Valley Seed and Grain.

It then became a matter of obtaining grain dealer and warehouse licenses from the I.C.C. On August 4, 1980, Howe, Mouttet, Kulig and the defendants appeared before the I.C.C. H.S.&G. could not be licensed because it was hopelessly insolvent. The defendants applied for licenses for T.C.&J. even though they were aware that Wallace Dick of the Warehouse Division of the I.C.C. was vehemently opposed to licensing any business entity that was being managed by Glenn Hemphill. The defendants had nothing to lose. Either they got the license and Glenn Hemphill was allowed to manage the elevator business, or they would get one without him as manager. The "[M]anager ineligibility to be employed by a licensed grain elevator" (Management Agreement para. 5, p. 4) was a ground for termination of the agreement as well as Glenn Hemphill's option to obtain T.C.&J.'s capital stock.

The lease payments of T.C.&J. to T.&F.L. were to be generated from operating income, but until licenses were issued there could be no elevator operation. Failure to make the lease payments could result in the termination of the lease. It was the responsibility of the defendants to obtain licenses for T.C.&J.

The license applications were filed with the I.C.C. on August 20, without the requisite bonds, so the license applications were given no consideration. In order to obtain the bonds the Freunds had to personally underwrite the bonding company in the amount of $119,000. Without the bonds and licenses, Glenn Hemphill, as the manager of T.C.&J., could not transact business.

On September 9, 1980, Kulig advised Hemphill by mail that T.C.&J. lease payment to T.&F.L. was in default, again a ground for cancellation and the end of the repurchase option. In order to save the option rights plaintiffs requested Charles Freund to use the $30,000 capital invested in T.C.&J. Charles Freund responded that the time for payment of the first lease installment was extended. On October 1, 1980, the second lease payment became due.

The bonds required by the I.C.C. were filed September 25, 1980, and on September 30, 1980, the licenses were issued authorizing T.C.&J. to deal in grain and operate a warehouse. The licenses were issued over the objection of Wallace Dick. The order granting the licenses, among other things, affirmatively required T.C.&J. to notify the I.C.C. if the net worth of T.C.&J. fell below $25,000.

On October 1, 1980, the semi-annual payment on the Federal Land Bank's first mortgages came due. A payment of $31,643.82 was paid by T.&F.L. with an insufficient funds check after the defendants refused Hemphill's request to seek a 30 day extension from the Federal Land Bank.

The Freunds then insisted that the unpaid September and October rental payments due from T.C.&J. in the amount of $19,270 be taken from T.C.&J.'s capital account which would bring the capital account below the I.C.C.'s $25,000 minimum, again threatening the option rights of T.C.&J. and Glenn Hemphill. Checks from two farmers totaling $20,000 were delivered to Charles Freund to cover the capital net worth shortage. On the advice of Kulig, Charles Freund returned the checks because, as Kulig reasoned, the $20,000 represented borrowed funds, and from an accounting standpoint would not change the net worth of T.C.&J.

On October 4, 1980, T.C.&J. paid T.&F.L. two months' rent, $19,270, and advised Hemphill to make up the shortage. In order to generate the needed capital Hemphill started up the elevator business on October 3, 1980, with purchase of a total of 5,517 bushels of grain on two deferred price contracts. Charles Freund ordered Hemphill to not buy any more grain, and to hold what he had purchased.

The defendants were under no obligation to rescue T.C.&J., and seemed to have no intention of doing so. Charles Freund testified that he discouraged local farmers from using the elevator because he did not approve of the plaintiffs starting up with so little working capital. Freund wanted to avoid losses from the elevator operation that might become the defendants' personal obligation to the bonding company under their indemnity agreement. At this point the defendants just wanted out.

Under the management agreement the plaintiffs had a right to personally inject capital into T.C.&J. On October 6, 1980, Glenn Hemphill telephoned Kulig to say he would put up his home and warehouse to save T.C.&J. A meeting that same day attended by Kulig, Charles Freund, Glenn Hemphill and Philip M. Kneifl (another Hemphill attorney) proved unsuccessful in salvaging T.C.&J. The defendants refused to accept Glenn Hemphill's post dated check (October 7, 1980) as a capital contribution to T.C.&J. They insisted on certified funds, a condition difficult to meet at the late hour the meeting took place, 3:00 p. m.

On that same date Kulig reported by telephone to the I.C.C. that T.C.&J. could not meet its net capital requirement. Kulig then wrote to T.C.&J. on behalf of T.&F.L. to cease all operations. On October 7, 1980, Kulig advised the I.C.C. in writing what he had reported by telephone the day before.

On October 7, 1980, the I.C.C. entered an order revoking the licenses of T.C.&J., but included a proviso that T.C.&J. had, "the right to deposit additional sums in the escrow account to cure the net capital shortage within ten days." The defendants refused to accept a cashier's check for $19,270 tendered by Glenn Hemphill on October 7, 1980, without informing him of his right to set aside the license revocation within ten days.

On October 7, 1980, T.&F.L. terminated the lease agreement of T.C.&J. On October 9, 1980, Kulig advised Glenn Hemphill the management agreement was terminated. On October 14, 1980, T.C.&J. surrendered its licenses. They were permanently revoked on October 17, 1980.

On October 21, 1980, the defendants' corporation, Griswold Seed and Grain, ($100,-000 in paid in capital) was licensed to operate the elevator. They took possession of the land and chattels and have held and operated them since.

Under the statutory charges made by the plaintiffs their own solvency is central to determination of whether the transaction of August 1, 1980, was preferential transfer. All the elements of a preferential transfer set out in Section 547 are present save that of insolvency at the time of the transfer.

Section 547(b)(3) requires that a preferential transfer must be made while the debtor was insolvent. Insolvency is defined in Section 101(26) to mean a financial condition such that the sum of the debts is greater than all of the debtors' property, at a fair valuation, not counting property that was transferred, concealed or removed with intent to hinder, delay or defraud creditors, and not counting property that may be exempted by an individual debtor under Section 522. Insolvency is indispensible to avoidance. *Stone-Ordean-Wells Co. v. Mark*, 227 F. 975, 976 (8th Cir. 1915).

■ The Bankruptcy Code presumes that the debtor was insolvent during the 90-day preference period. (11 U.S.C. § 547(f)). The presumption requires the party against whom the presumption exists to come forward with some evidence to rebut the presumption which the defendants have done. The burden of proof remains on the party in whose favor the presumption exists. Fed.R.Evid. 301. Insolvency is a factual determination. *Kaufman v. Tredway*, 195 U.S. 271, 273, 25 S.Ct. 33, 34, 49 L.Ed. 190 (1904).

The plaintiffs, using Section 547 as debtors-in-possession permitted by 11 U.S.C. § 1107 claim that on or about August 1, 1980, they were insolvent, assets of $2,664,-424.97 and liabilities of $2,820,981.54, or a deficit net worth of ($156,366.57).

The defendants artfully show that the plaintiffs were solvent on the key date with a net worth of $617,549.72. (Defendants' Closing Argument at p. 4)

The plaintiffs in turn, and as artfully toss this net worth figure about and after, "making the corrections for liabilities erroneously excluded and for assets improperly included or overvalued," find a negative net worth of ($48,984.25). (Plaintiffs' Reply Brief at p. 24)

The place to start is Plaintiffs' Exhibit 203 which shows the net worth deficiency of $156,366.57 from whence the court after mercifully reducing the plaintiffs' best guess to round numbers will make its own adjustments to plaintiffs' August 1 assets of real estate, accounts receivable and "contingent" liabilities. Plaintiffs' Exhibit 203 was not designed to show how poor the Hemphills were.

Items 4, 5, and 8 on plaintiffs' Exhibit 203 set out the following assets in form of real estate.

| | | |
|---|---|---|
| 4. | 250 acre farm | $ 650,000 |
| 5. | 40 acres | 100,000 |
| 8. | Remainder interest in 200 acres of land life tenant age 67 | 302,000 |
| | | $1,052,000 |

Both the plaintiffs and the defendants had the real estate appraised by competent appraisers. Their findings are as follows:

Plaintiffs' appraiser, Gary Thein.

| | |
|---|---|
| 250 acres at $2,600 per acre | $ 650,000 |
| 40 acres at $2,500 per acre | 100,000 |
| 120 acres and 80 acres at $2,175 per acre | 435,000 |
| | $1,185,000 |

Defendants' appraiser, James Grove.

| | |
|---|---|
| 250 acres at $2,649 per acre | $ 662,145 |
| 40 acres at $2,950 per acre | 118,000 |
| 120 acres at $2,750 per acre | 317,515 |
| 80 acres at $2,237 per acre | 178,940 |
| | $1,276,600 |

Both appraisers based their findings primarily on a "market approach" and considered "income approach" only in support of and ancillary to the market data evaluation.

In appraising the 40 acre parcel located near the elevator Mr. Thein gave no consideration to the strategic proximity to Griswold, or that the same parcel was recently acquired by the debtors for $118,000. In a July 1980 appraisal of the 120 acres of land in dispute here R. J. Wilson & Co., accepted by both parties in this proceeding, used the 40 acre $118,000 price as a valid comparative sale.

The court gives greater credence to Mr. Grove's appraisal of the 250 parcel for no other reason than his considerably greater experience and breadth of his comparative sales analysis—16 basic comparables compared to Mr. Thein's four basic comparables. Mr. Grove states, "[t]here is no question as to the superiority of this farm measured against the market. . . ." Mr. Grove made separate appraisals of the 120 ($317,515) and 80 ($178,940) acre parcels. Mr. Thein combined them into one 200 ($435,000) acre parcel. The result is a difference in estimates of $51,465. The 120 acre parcel has a set of buildings, the 80 acre parcel does not. The 120 acres are flat to gently rolling—the 80 acres are much steeper. There is timber and a ditch on the 80 acres and none on the 120 acres. Mr. Thein states, "the productivity on the 80 acres is less that [sic] the productivity on the 120 acre parcel." The defendant argues that by combining the 120 and the 80 as one parcel, Mr. Thein "artificially" deflated the value of both. The court agrees with the defendants that there is no apparent logical reason for combining the two. When considered as a unit, Mr. Thein agreed that the 120 acre parcel would be worth $2,600 per acre compared to $2,646 estimated by Mr. Grove. A difference of $9,200 on the 200 parcel. In order to reach a $2,175 per acre average on the entire 200 acres the 80 would have to be worth far less than $2,175 per acre. It would have to be more like $1,660 per acre and far below any comparative sale.

Since the 200 acre parcel was subject to a life estate both appraisers made adjustments to ascertain the plaintiffs' remainder interest.

| | |
|---|---|
| Mr. Thein's appraisal less the life estate remainder interest | 435,000 |
| | 133,000 |
| | 302,000 |

| | |
|---|---|
| Mr. Grove's appraisal less the life estate remainder interest | 546,455 |
| | 217,307 |
| | 329,148 |

The method used by Mr. Grove in establishing the value of the remainder interest in the 200 acres has not been questioned. The court accepts his assessment of the value of the life estate and remainder interest.

The defendants challenge any adjustment that includes any value whatever for the life estates. They argue since there is no liability shown to exist, a pledge of the life estate by way of the mortgage to the Federal Land Bank constituted a gift of the life estate to the plaintiffs.

■ A vested remainderman is only entitled to the difference between the market value of the undivided fee and the present value of the life estate. The court finds no other fact in the record that would warrant a finding that the life estate had been abandoned or given to the defendants. There was no reason to list the life estate as a liability on Plaintiffs' Exhibit 203 if the asset side of the ledger did not include it. It is also a fact that Glenn Hemphill and the life tenant, his mother, farmed the 200 acres on a one half share crop basis.

The court's adjustments for real estate increases the plaintiffs' net worth $57,000 (rounded).

At item 8 on the liabilities side of Plaintiffs' Exhibit 203 the plaintiffs show $336,-277.89 liability on their guaranty of H.S. &G.'s debt to the Oakland Savings Bank.

■ The Oakland Savings Bank had a prime security interest in the following property: office equipment; seed equipment; hog equipment; growing corn crop; farm machinery and hogs. Under Iowa law a guarantor required to pay the debt of his principal has an enforceable right of subrogation in the collateral securing the obligation. *Ohio Casualty Ins. Co. v. Galvin*, 222 Iowa 670, 269 N.W. 254 (1936); *American Surety of New York v. State Trust and Savings Bank*, 218 Iowa 1, 254 N.W. 338 (1934).

■ If the guarantee obligation is to be included among the debtor's liabilities for purposes of determining his insolvency, then the subrogation and contribution rights against other collateral must also be taken in account. In the case of *Matter of Ollag Construction Equipment Corp.*, 578 F.2d 904 (2nd Cir. 1978), the debtor was guarantor of a secured debt owed by its parent corporation. The parent was insolvent. The trustee wanted to include the contingent guarantee liability to prove that the debtor was insolvent. The trial court included the liability but treated the debtor's subrogation rights in the collateral securing the guaranteed debt as though they were worthless.

On appeal the Second Circuit said:

Learned Hand's landmark opinion in *Syracuse Engineering Co. v. Haight*, 97 F.2d 573, 576 (2d Cir. 1938), taught us that contingent subrogation and contribution rights must be valued as assets in determining solvency. See also *Updike v. Oakland Motor Car Co.*, 53 F.2d 369, 371 (2d Cir. 1931); *Wingert v. President Director & Company of Hagerstown Bank*, 41 F.2d 660 (4th Cir.), cert. denied, 282 U.S. 871, 51 S.Ct. 77, 75 L.Ed. 769 (1930). *Cf. Schwartz v. Commissioner of Internal Revenue*, 560 F.2d 311, 317 (8th Cir. 1977). In the case at bar, we are left in murky obscurity regarding the actual value of . . . (the debtor's) contingent assets. The courts below treated . . . (the debtor's) subrogation right against . . . (its parent) as effectively valueless. It is obvious, however, that, holding a valid security interest in . . . (the parent's) equipment as collateral for the $200,000 note, the Bank could expect to collect a substantial portion of its debt even if . . . (the parent) were insolvent. . . . As subrogee, . . . (the debtor) was the successor to all of the Bank's rights against . . . (the parent), including the Bank's security interest in . . . (the parent's) equipment. . . . Accordingly, we must conclude that the bankruptcy judge's finding, affirmed by Judge Elfvin, that . . . (the debtor's) subrogation right against . . . (the parent) was of minimal worth is clearly erroneous.

*Id.* at 908.

■ Consequently, if plaintiffs' contingent liability to the Oakland Savings Bank

of $336,277.15 is to be included in their balance sheet, then their contingent subrogation and contribution rights must be valued as assets in determining solvency. *In re Ollag Construction Equipment Corp., supra.*

■ This adjustment adds another $336,277.89 to the plaintiffs' net worth. The plaintiffs were solvent on August 1, 1981, prior to the transfer of the land and chattels. Without even considering the rest of the adjustments argued for by the defendants the court can find a net worth of approximately $237,000. That still leaves a considerable margin for any depreciation of the chattels. There was no preferential transfer.

Section 548(a) sets out the elements of a fraudulent transfer. It provides for purposes of this proceeding:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of filing of the petition, if the debtor—
>
> (1) . . .;
>
> (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (ii) was engaged in business, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
>
> (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
>
> (b) . . . .
>
> (c) Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on any interest transferred, may retain any lien transferred, or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.
>
> (d)(1) . . . .
>
> (2) . . .—
>
> (A) "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, . . .

The plaintiffs plead that they received less than the "reasonably equivalent value" as consideration for the transfer of the land and chattels.

"Reasonably equivalent" is similar to the former "fair equivalent" (Section 67(d)(1), (e) B.A. (11 U.S.C. § 107)), although a transfer in "good faith" is no longer relevant. 9A Am.Jur.2d (Bankruptcy) § 564, p. 191. Reasonable equivalency is a broader concept than the former fair equivalency. 4 Collier on Bankruptcy ¶ 548.09, p. 549.93, n. 3 (15th ed. 1981).

■ A disparity between total secured debt and value of collateral alone does not call for a finding of a lack of reasonably equivalent value. See *Jackson v. Star Sprinkler Corp. of Florida*, 16 C.B.C. 626 (8th Cir. 1978). Value given for a mortgage, for instance, on property worth somewhat more than the amount of the value may be a reasonably equivalent value. "Whether the transfer is for 'reasonably equivalent value' in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of facts. *Klein v. Tabatchnik*, 610 F.2d 1043 (2d Cir. 1979)." 4 Collier on Bankruptcy ¶ 548.09, p. 548.97 (15th ed. 1981).

■ The burden of proof is on the plaintiffs. *Rosenberg v. Trautwein*, 624 F.2d 666 (5th Cir. 1980); 4 Collier on Bankruptcy ¶ 548.10, p. 548.106 (15th ed. 1981).

There was certainly a substantial amount of consideration given for the land and other chattels valued at $1,300,000 plus personal property subject to a security interest.

The $250,000 cash; the antecedent debt of $226,000; the loan assumption of $341,000; and the value of the option to repurchase.

The value of the option to repurchase is difficult. It was not worth $451,-925.00 as a defendant's witness testified. That value did not take into consideration that the transfer documents contained some rather stringent conditions, so stringent that it was unlikely the plaintiffs would ever be able to fulfill them. The option contract imposed no binding obligation on T.C.&J. If the option were exercised the grain elevator's value may have appreciated. The option's value at the time it was granted was too speculative. Thus, the court cannot place any realistic value on the option to repurchase. That is not to say it was valueless, but whatever the value may have been, it must be added to the $850,000 of readily ascertainable value.

There are no precise scales to weigh the consideration given for the transfer of land and chattels. The court can and has considered other factors. *Klein v. Tabatchnik, supra.* The court has considered the inability of the plaintiffs to find an outright purchaser of the elevator and swine business; the fact that the agreements were ostensibly structured for the benefit of creditors; and as will be pointed out later in this decision, that it was intended as a security transaction rather than an outright sale.

The court finds that there was a reasonably equivalent value given in exchange for the land and chattels.

The plaintiffs have failed, by reason of this finding, to prove all the requisite elements of a fraudulent transfer under Section 548(a)(2)(A) & (B). It is not necessary to determine whether the plaintiffs were made insolvent, or left with insufficient capital, by reason of the transfer.

The court has already stated that it finds the intent of the parties to the August 1, 1980, transaction was to create a security device.

It is stated in 59 C.J.S. Mortgages § 36 p. 72 that:

At common law, and under some statutes, the question whether a deed absolute in form is to be taken as a mortgage depends on the intention of the parties with respect to it at the time of its execution. In order to convert a deed absolute in its terms into a mortgage it is necessary that the understanding and intention of both parties, grantee as well as grantor, to that effect be concurrent and the same. A mere secret intention on the part of one of the parties, not disclosed or communicated to the other, will not have the effect of changing the character of the transaction. Still less will this result where the parties have directly contradictory intentions. It has been held that the intention of the parties, in order to change the character of the instrument appearing on its face, must be clearly established, and that when it is doubtful whether the deed was intended as a mortgage the intention of the parties as expressed in the contract should have some weight; but it has also been held that in case of doubt as to the intention of the parties the court will lean toward construing the instrument as a mortgage.

A deed of conveyance absolute on its face is a contract. On the subject of statutory construction on this broad legal theme, 17A C.J.S. Contracts § 586 pp. 1138, 1139, states that:

Unless a contrary intention appears in the instrument, the words used are presumed to have been used in their ordinary or customary meaning, deliberately and with intention. The law does not assume that the language of the contract was carelessly chosen; but it must be presumed that the parties meant something by the words used, that they intended to achieve something definite and concrete in the contract, and that they intended the consequences of its performance.

Where words having a definite legal meaning are knowingly used in a contract, the parties thereto will be presumed to have intended such words to have their proper legal meaning and effect, in the absence of any contrary intention appearing in the instrument.

It is presumed that the one who draws up a contract intended to express clearly his intent therein, and that he used words favorable to his interest. Where a written contract purports on its face to be a complete expression of the whole agreement, it is presumed that the parties introduced into it every material item and term; and the burden of showing that a contract means other than it says must be met by the litigant making the assertion. Parties have the burden of establishing the construction which they seek to place on words used in a contract as the only construction which could be fairly put thereon; and if an agreement is capable of several meanings, the onus is on the party seeking to show that his interpretation is the correct one to establish it with reasonable clearness.

The applicability of the foregoing admonitions touches all the contracts of August 1, 1980. In this regard the law of Iowa is the law of persuasive consideration and is relied on by the plaintiffs to the effect that equity, under some circumstances, will treat an absolute deed as a mortgage. *Koch v. Wasson,* 161 N.W.2d 173 (Iowa 1968).

█ Bankruptcy courts are essentially courts of equity, and their proceedings are inherently proceedings in equity. *Pfister v. Northern Ill. Fin. Corp.,* 317 U.S. 144, 152, 63 S.Ct. 133, 138, 87 L.Ed. 146 (1942); *Pepper v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); *Local Loan Co. v. Hunt,* 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1049 (1934); *In re Peoples Loan and Investment Co.,* 410 F.2d 851 (8th Cir. 1969); *In re Black Ranches, Inc.,* 362 F.2d 8, 15–16 (8th Cir. 1966); *In re Kansas City Journal-Post Co.,* 144 F.2d 791 (8th Cir. 1944).

█ When it happens that a transferor of an absolute deed claims that the deed was only intended as a security for payment of a debt a court of equity may examine the transaction and treat it in accordance with what it finds to be the actual intent of the parties as distinguished from their legal intent. The question is, what rights does the law give these parties under the arrangement made, not what they conceive their rights to be. *Guttenfelder v. Iebsen,* 230 Iowa 1080, 300 N.W. 299, 303 (Iowa 1941).

█ This is an extraordinary power of a court of equity like setting aside a deed for fraud. See *e.g., Stephenson v. Stephenson,* 247 Iowa 785, 74 N.W.2d 679 (1956); *Leonard v. Leonard,* 234 Iowa 421, 12 N.W.2d 899 (1944); *Brewster v. Brewster,* 194 Iowa 803, 188 N.W. 672 (1922). There is a presumption in favor of regularity, and the evidence must establish the mental condition of both parties at the time of the transfer. *Koch v. Wasson,* at 178 *supra; Collins v. Isaacson,* 261 Iowa 1236, 158 N.W.2d 14 (1968).

The real issue is whether the plaintiffs had a mere option to purchase the land and chattels from the defendants or whether the defendants took title as security for a loan.

█ Each case is different and the outcome based on its own peculiar circumstances by, "looking behind the form and at the true nature of the transaction and the intention of the parties." *Brown v. Hermance,* 233 Iowa 510, 10 N.W.2d 66, 68 (1943).

█ It is also the rule in Iowa that where an absolute deed is accompanied by a contract to reconvey on specified conditions, and some doubt exists as to whether the conveyance was intended to be absolute or as security for a debt, the contract will be construed to be a mortgage rather than a privilege to repurchase or a conditional sale. *Koch v. Wasson, supra; Collins v. Isaacson, supra; Brown v. Hermance, supra; citing, Hughes & Dial v. Sheaff,* 19 Iowa 335, 342 (1865); *Fort v. Colby,* 165 Iowa 95, 144 N.W. 393 (1913); *McRobert v. Bridget,* 168 Iowa 28, 149 N.W. 906 (1914); *Trucks v. Lindsey,* 18 Iowa 504, 505 (1865). Quoting from *Hinman v. Sage,* 208 Iowa 982, 221 N.W. 472, 473 (1928), "If all of the prerequisites are shown, and, under the evidence, a doubt exists as to whether the conveyance was intended to be absolute or as a security

for a debt, the instrument will be construed as a mortgage."

It is incumbent for the plaintiffs to prove that the consideration for the deed was an existing indebtedness, and that it was not extinguished by the conveyance but was kept alive. *Greene v. Bride & Son Construction Co.*, 252 Iowa 220, 106 N.W.2d 603, 606 (1960), *citing, Hinman v. Sage, supra; Shanda v. Clutier State Bank,* 220 Iowa 290, 260 N.W. 841 (1935); *Clark v. Chapman,* 213 Iowa 737, 239 N.W. 797, 800 (1931); *Reusch v. Shafer,* 241 Iowa 536, 41 N.W.2d 651 (1950).

The party claiming a deed to be a mortgage must establish the fact by clear, satisfactory and convincing evidence. *Collins v. Isaacson, supra; Greene v. Bride & Son Construction Co.,* 106 N.W.2d at 607 *supra; citing, Brown v. Hermance, supra; Moeller v. Strohbeen,* 232 Iowa 1282, 8 N.W.2d 254 (1943); *Reusch v. Shafer, supra; Blum v. Keene,* 245 Iowa 867, 63 N.W.2d 197, 216 (1954). Some cases have used the term "clear and satisfactory." *Bradford v. Helsell,* 150 Iowa 732, 130 N.W. 908, 909 (1911); *Maytag v. Morgan,* 208 Iowa 658, 226 N.W. 93 (1929); *Guttenfelder v. Iebsen, supra; Miller v. Martin,* 246 Iowa 910, 70 N.W.2d 141 (1955).

The Iowa Supreme Court defined "clear and convincing proof" which is required in cases involving the question in the instant case: "The clear and convincing proof required in these cases means merely that the proof is so established that no reasonable uncertainty or doubt as to the truth thereof confronts the trier of fact. *Koch v. Wasson, supra; Miller v. Martin, supra.*

In determining the intent of the parties, in this quest for their actual rather than legal intent, the Iowa courts also examine all the circumstances of the transaction; the pecuniary relationship of the parties; early negotiations, contemporaneous acts as well as the written documents.

Circumstances that the courts have found determinative in decreeing an absolute deed to be a security have been inadequacy of consideration, *Wilson v. Patrick,* 34 Iowa 362 (1872); a necessitous or impecunious transferor with weak bargaining power, for example, the hard pressed farmer conveying to a loan broker, *Haggerty v. Brower,* 105 Iowa 395, 75 N.W. 321 (1898); and where the transferor is permitted to remain in possession. In the latter situation the fact that possession was by way of a lease-back does not negate a possible inference that the transfer was a security device. *Davis v. Wilson,* 237 Iowa 494, 21 N.W.2d 553, 560 (1946); *Fort v. Colby, supra.*

The record reveals the evidence is clear, and the court's mind is at ease that the sale, lease-back and option to repurchase agreements were intended to be a security transaction. The conclusion is inescapable.

There was certainly a necessitous transferor. The plaintiffs had all but lost their elevator business, it was closed, the licenses cancelled, and efforts to sell it had failed. The attempts at raising operating capital had also failed. The defendants were in fact the plaintiffs' last chance. The plaintiffs' position was so desperate that after the agreements were completed they were signed by the plaintiffs against the advice of their own legal counsel.

The plaintiffs retained possession of the land and chattels.

The documents themselves were so tightly drafted, and overburdened and weighted in favor of the defendants as to place the ultimate and intended recapture of the businesses, land and chattels, practically speaking, beyond the plaintiffs' reach.

There was a creditor-debtor relationship at all times prior to cancellation and forfeiture. The repurchase of the land and chattels was fixed with reference to repayment of both antecedent and contemporaneous debt. Mouttet testified that, "[t]he price was arrived not so much on the appraisal value as it was on the basis of their need for $250,000." The amount of the lease payments were fixed to correspond to a 14% return on the defendants' investment.

Mr. Mouttet who initiated and nurtured the idea of the sale—lease-back—and repur-

chase agreement, ostensibly on the plaintiffs' behalf, considered it a security transaction, as did the plaintiffs' accountant, Touche Ross & Co., and their attorney, Richard Howe. Howe regarded the transaction as nothing more than a "financing" device.

The defendants themselves regarded the transaction as a financing arrangement not an absolute sale.

Jack Freund testified:

Q. Let's go on through these documents. We've been talking about a lease. How was that $9135 a month determined, do you think?
A. I think it was arrived at by our investment in the property.
Q. What, broken down over a certain period of time at a certain interest rate or return, is that how it was done?
A. Certain return.
Q. Was that the 14% that's been mentioned—
A. Right.

Charles Freund also testified that the defendants did not want to own the elevator and they regarded the change of title temporary until the repurchase option could be exercised.

Glenn Hemphill testified by deposition and at the time of trial to the same effect:

Q. And you've signed enough warranty deeds and enough mortgages to know the difference between the two? .
A. The difference between the two that I think of is that we bought several pieces of land, or any deed—that we've had before were one or two pages and would cover the sale price and the closing statement and not the 47 page thing that we saw on August 1. That I think of as a loan—or not a loan but an instrument to do two things: protect the Freunds in their involvement and putting additional money into a troubled elevator operation to get a license to operate in the 1980 crop season.

▋ Where the court of equity concludes an absolute conveyance was in fact a security transaction the court must grant only such relief as is just and equitable.

The equities of this case are clearly with the plaintiffs, but in seeking equitable relief they must themselves show equity. *Koch v. Wasson, supra.* The court is not a guardian for adults who are capable of acting for themselves.

▋ Where a conveyance is held to have been given as a security an equitable redemption attaches necessarily and conclusively to any grant given as a security. Equity forbids an irredeemable mortgage. *Koch v. Wasson, supra.* 55 Am.Jur.2d (Mortgages) § 511, p. 503 (1971). Equity also abhors a forfeiture. *Roshek Realty Co. v. Roshek Bros. Co.,* 249 Iowa 1207, 87 N.W.2d 8 (1957); 27 Am.Jur.2d (Equity) § 74, pp. 596, 597 (1966).

The plaintiffs are entitled to redeem their land and chattels. *Tansil v. McCumber,* 201 Iowa 20, 206 N.W. 680 (1925).

In addition they are entitled to the possession of the property during a period of time the court finds suitable within which they may exercise that right of redemption. *Herring v. Neely,* 43 Iowa 157 (1876); See Blum, *Iowa Statutory Redemption After Mortgage Foreclosure,* 35 Iowa Law Rev. 72 (1949).

The defendants should return the possession of the land and chattels to the plaintiffs within thirty days of the filing of the order to be entered in accordance with this memorandum of decision.

The land and chattels are subject to a lien in favor of the defendants of $476,000 plus interest at 14% from August 1, 1980, plus the value of the cost of any improvement they made after they took possession, less any profit they realized while the defendants operated the businesses, unless the after tax profit exceeds the amount of improvements in which instance the lien of the defendants shall be reduced by the amount the after tax profits exceed the amount of the improvements. "Improvements" include: physical improvements, repairs, payment of any property tax, payment of any valid liens, or discharge of any lien superior to the rights of the plaintiffs,

or for the preservation of the land and chattels. The lien is inferior to all prior and subsisting liens and encumbrances.

The plaintiffs may redeem the land and chattels transferred to the defendants upon satisfaction in full of the defendant's lien on or before October 21, 1982.

The plaintiffs are not entitled to any relief other than that stated above, which in the court's judgment, should satisfy them fully. The plaintiffs chose, and to a large degree, furthered the route to their present financial and emotional discomfort. The relief granted alleviates the harsh conditions of the agreements they voluntarily signed, and softens the heavy handed manner in which those conditions were invoked. The court can find no just basis upon which to fashion relief in the way of pecuniary damages.

The defendants are enjoined from disposing of any property which is the subject matter of this decision other than the disposition of grain stored in the ordinary course of business.

The defendants shall furnish the plaintiffs with an independently prepared inventory of the property under consideration at the time of the turnover of possession to the plaintiffs, and an income statement covering the period the defendants were in possession of the land and chattels.

Each party shall bear their own costs.

The plaintiffs are directed to submit to the court a settle order in accordance with the foregoing.